May it please the Court, my name is Stephen Barry. I represent the plaintiff's appellant in this case. I'd like to reserve three minutes of my time for rebuttal with the leave of the Court. Plaintiff's appellants Ms. Cruz, Ms. Menendez, and Ms. Eastman respectfully submit that the complaint below should not have been dismissed if Twombly, Iqbal, O'Brien, Kendall, City of Anaheim have continued force in this circuit. There, as the Court is probably aware, considerably controversy in the circuits and in the district courts about what plausibility means under Twombly and Iqbal. Is it a heightened feeling? Kagan before we get to that, could you address the Article III argument, that is to say unless there's Article III standing for your three clients, we simply can't get to the merits, and the Supreme Court says we have to decide that question first. The argument is that they have not alleged that they themselves have been harmed. Could you respond? Yes. There's both concrete Article III standing and also antitrust standing. Okay. The complaint If you address the Article III is what I'm interested in at the moment. Well, we plausibly allege concrete injury because of direct purchases at monopoly prices of routine diagnostic testing. But they argue because of the deductible that you've not shown that they will in fact be harmed. How do you respond? That is just not what the complaint alleges, Your Honor. Okay. Put me to the complaint where you allege that. Can I make a third amended complaint now? Second amended complaint. Last complaint. Okay. I've got the complaint. Second amended complaint. I've got the complaint in front of me, so where do you make an allegation that gets around that? I take the Court to excerpt of record 125, paragraph 161, which says that the plaintiff is not relating to Ms. Cruz. She paid Quest $28.35 as part of a deductible in 2012. I'm sorry, she paid $37.55 in that time period as part of her deductible. Then another testing, she paid Quest at monopoly prices as alleged, $14.30, $75.10. Okay. Now, their argument is, but if she gets to the deductible by other means, other expenses, then of course this all washes out. Well, this is clearly alleged, but for these class rep --"proposed class representatives," she had not exhausted her deductible by other doctor visits or other billings. Okay. But that's the question. Do you allege that she has not exhausted by other expenses? Yes, by we are basically saying if she had exhausted her deductible, she wouldn't be paying these dollars to Quest. If she had exhausted her deductible, she wouldn't be paying these dollars to Quest. So we're supposed to infer from this that she did not exhaust her deductible? Well, I think it is a reasonable inference, but the fact is that she did not. But that's your argument. Right. Okay. I get it. Dollars in monopoly money changed hands as part of her deductible obligation. She had not, if she had exhausted her deductible by doctor visits or other billings before she got to the diagnostic testing, they may have an argument. That's not this case. Okay. But you don't specifically say it, but you say it's reasonably inferable from this. Well, I think it's enough to say that she paid monopoly dollars as part of her deductible. I mean, we can't say that. No, I get the argument. Okay. Now, let me just make sure the record is clear. Ms. Menendez, 2004, August, paid $82.10 out of her deductible. She also paid Quest $19.90 and $8.64 for test administering. No, no, I've got it. You don't need to keep on it. That's excerpt of record 162. No, no, I got it. And just for completeness, for Ms. Eastman, excerpt of record. I got it, I got it. Okay. Well, we just want to know your argument on the deductible. Okay. Go ahead with the plausibility argument. Okay. As you know, I believe that there's considerable controversy as to what plausibility means in a short, plain statement of an antitrust allegation. Six circuit courts in the last five years have issued opinions correcting the district courts, and the seventh is the Third Circuit in the In re Lipitor supplemental authority, which is our last supplemental authority. Now, at the risk of appearing too colloquial, there at having really looked at all these cases with care, there seems to be out there in the district court, and I'm not saying necessarily this characterizes this judge, that if I'm skeptical, plausibility means that I'm not skeptical. Plausibility means it's not – it's improbable. So they're substituting a probability standard or a – I think we know the law in this circuit. It's, I think, very nicely stated in a case called Starr v. Baca. Yes, I think so, Your Honor. As you said in Starr v. Baca, this complaint, quote, and I believe this applies to this, does not merely state the – recite the elements of the cause of action, but contains the sufficient allegations of underlying facts to give notice. And then also in your O'Brien opinion, O'Brien puts – as O'Brien puts it, and I believe this is this complaint, the complaint contains sufficient factual matter, except that it's true, to state a claim to relief that is plausible on its face. Okay. So now that we can get past that, at least for purposes of argument, what do you say is the antitrust violation? That's where I'm having trouble. The antitrust violation is – You're assuming everything you say is plausible. Where is the antitrust violation? It is not disputed below – implausibility is not disputed that the relevant market definition as alleged, the market power of quest in the relevant market as alleged. The only issue here is whether the four exclusionary acts in combination under city of Anaheim, did they – are they plausibly contributing to the 67 percent market share monopoly power. That is – that – and that is – is there unlawful maintenance of monopolization by four exclusionary conducts, acquisition, plan, exclusive dealing, provider exclusive dealing, and tying. Now, we do have a separate tying count. So – The tying one seems to me not a very strong one. The one that seems to me the strongest is this leveraging by offering, at least as you allege, a really good price when the doctor pays on the capitation and a very high price when either the patient or the plan pays. I mean, that strikes me as your strongest argument. Okay, I – So how is that a – but how is that a – Are you talking about the tying claim? No. The economic coercion? No, no. I'm sorry. I didn't understand. I'm talking about the leveraging claim. I think it's what you call it. The claim where not tying, but the theory is, I gather, that Quest offers to the doctor when they're paying capitation claims a really good price when the doctor himself or herself is paying out of the doctor's pocket. Yes. And once they do that, the doctor then bills through – assigns through Quest the testing for the patients who are either paying themselves or paying through their plans. And on that one, they're gouging. That's your argument. Yeah. So why is that a – why is that an antitrust violation? Because under Gensply, McWane, Microsoft, it is de facto exclusive dealing. They're setting up the economic circumstances downstream such that there's a substantial penalty if a provider does not distribute Quest diagnostic testing. And so it's a de facto exclusive deal. You do not need formal contracts, and it's – as alleged, we don't say there are formal contracts. There are formal contracts on exclusive dealing in the capitated market that makes it different to break the tie or the provider-exclusive dealing for the rival. But we never allege, and the judge missed that, with all due respect, in the complaint. The relevant market exclusion is economic de facto exclusive dealing. And it's very similar to the tying claim. So we allege, look, if this isn't the only viable economic option and there's coercion under tying, at the very least, it drives significant portion of distribution away from the rivals by a firm with market power. So they are related. They're very closely related. So if we don't meet the tying test, I think we do meet the Gensply-McWane-Microsoft test. As you know, Rule 8A2 only requires that a short, plain statement of the antitrust claim. There is no – under Twombly, Iqbal, Kendall, and Black and Decker in the – Kendall's in this circuit, Black and Decker in the fourth, the Court is not to act as a gatekeeper, is not to high – to apply a heightened pleading standard to antitrust cases because they're expensive and basically are – Well, yes, that's all true. On the other hand, Twombly doesn't seem to say – we're stuck here. The Supreme Court seems to have a de facto different standard for antitrust cases. And look at Twombly. Well, I – Now, the Court won't admit it. The Court, in a way, can't admit it because Rule 8A applies to antitrust cases as well, 1983 cases as well as all the others. But as you look at the behavior of the Court and even the explanation in Twombly, the Court says we're going to look very carefully at the complaint before we put the defendant to the expense of discovery and all of that because the settlement value of the court case goes up astronomically as soon as you get past 12B6. Well, you addressed that in Starr v. Barclay. You went through it, and you were a little – and you came to a kind of a resolution. And I believe that we meet the Starr – your best shot at figuring out what the Court wants. And, of course, there's been several circuit opinions since Starr v. Barclay that address these issues. And – but Twombly does say, and Iqbal expressly does say, and the cites are in our brief, there is no heightened pleading standard. The language, heightened pleading standard, is an artifact from the fact that they replaced Cohen v. Conley beyond a reasonable doubt with plausibility, and the Court viewed that as a heightened pleading standard. Now, now it's being morphed at the district courts into a probability standard. Well, I'm a skeptical standard. And that's what this district court did. Or it's – it really is going as far as to be a predominant standard. They're effectively entering summary judgment without discovery, without summary judgment motion, and without a trial. Under Kendall, we believe this complaint does address who, what, who did what to whom, where, and when, the five Ws. We believe that this complaint is not characterized by general, unadorned general allegation. There's no hand-waving here, in my estimation. There's no application of mere labels, and no mere pleading in a conclusory fashion of elements. Now, there – we do allege, or assert in this Court, there were seven errors throughout the opinion by the district court. I don't have time to go through them all here. One, a repeated failure to evaluate all exclusionary conduct in combination. Although the Court pays lip service to the City of Anaheim, if your court – if you examine what the rulings as to each exclusionary act, there was not a holistic, synergistic combination there. In fact, if the – if it had engaged in that analysis and these – the findings that are individual dismissal of exclusion as not making a claim on its own, you can find those at 1516, Excerpt of Record, 1415, 12, 10, 11, 12, 12, and 13, 12, 12, and 13. Now, if it had engaged in combined analysis, it would first have to address. After the first quest acquisition, the relevant market became highly concentrated, raising significant competitive concerns. The Herfindahl Index was off the charts. No, that's Excerpt of Record, 110, paragraph 91. Second, the degree of foreclosure, as alleged, very specifically, and we believe plausibly, at least 65 percent foreclosure due to acquisitions and the distribution crippling allegations, the three allegations. That is far in excess of the less than 30 to 40 percent foreclosure. Microsoft says, and I believe it's the prevailing law, that you have to show for a monopolization action. And here, I want to refer to the Court to Excerpt of Record, 113, Excerpt of Record, 122, for those sites. You're down to about a minute. Do you want to reserve? Let me just finish this line of argument, and thank you for your patience. Three, the Court would have to address, and it never did, and none of this did it ever address, that seven Quest rivals had exited the market as specifically alleged as a consequence of the distribution crippling and the acquisitions. Three were bought out, the total extinguishment of a rival. And as Grinnell and Standard Oil in 1911, Grinnell in 1966, make very clear, you can't merge to monopoly. And as Rita and Hovenkamp say, it's clear. You can't do that. And so the — and it's not been disputed that acquisitions can be a key element to monopolization. As to that, the seven exits, I refer the Court to Excerpt of Record 10, 110, 112, 113, 121, 121, 95, and 118. I have eight seconds, and I thank you for your patience. Thank you, counsel. I didn't cover any of the minutes. May it please the Court, Your Honors. My name is Richard Rask, and I represent Eppley Quest Diagnostics. Your Honors, Judge Oreck gave this case thoughtful consideration three times with three different versions of the complaint. And in each instance, he properly applied the Twombly standard. He properly applied Continental Or, and considered the allegations of exclusionary conduct both individually and collectively. The fact is, the Second Amended complaint does not tell a plausible story of any kind of competitive harm. And viewed closely and viewed in whole, it, in fact, depicts a competitive market for clinical laboratory services in Northern California. Let me call your attention, if I may, to a few of those specific allegations. The complaint alleges, the Second Amended complaint, the one that was the final version, alleges that physician groups negotiate with Quest for low capitation rates, allowing them, in turn, to offer low capitation rates to HMOs. The Second Amended complaint alleges that large insurance companies, such as to get big discounts from Quest. The complaint alleges that Quest faces substantial competition, that's the phrase in paragraph 18, substantial competition from its number one national competitor, LabCorp, and that it also competes with other unidentified laboratories in Northern California. Further, the Second Amended complaint alleges that Quest enjoys substantial economies of scale, that's from paragraph 80, lower unit costs than its competitors, also in paragraph 80, enabling it, and that in addition, it is enabled to, quote, negotiate volume discounts that allow it to operate more and to offer steeper discounts for the benefit of consumers. Now, these are not features of a market that is under the thumb of a monopolist. They depict a competitive market that's functioning well. And if I may, let me jump ahead to the individual plaintiffs we have here. Antitrust law is about protecting competition, and it's about protecting consumer welfare. There are three consumers who are plaintiffs in this case and who make the following allegations. And I'd like to address the standing point as well that was raised by Judge Fletcher, but let's look specifically at the prices that they paid. Ms. Eastman faced list charges from Quest for her tests or her daughter's tests of $747. Yeah, but that's all that phony baloney numbers stuff. Just focus on the amount she pays. I mean, we all got those bills that say you owe $3 million, but the actual price is 25 cents. Let's talk about the 25 cents, the actual price paid. I hear you, Your Honor. If I may take an intermediate step before getting to the amount paid, the insurer then determines an allowed amount off of that list price, which is, as you say, often quite a bit higher. I don't know who pays that, but I've never seen anybody pay it. Yes. So the insurer in her case, it was Anthem Blue Shield, allowed that test $87.50. Right. And then she ultimately paid $43.64. She paid $43.64. Okay. And the insurer paid approximately the same amount. Right. It was about close to a 50-50 split of that amount. Ms. Cruz, covered by Blue Shield of California, faced a list price. So where are we going with this? My point, Your Honor, is twofold. First of all, I want to point out that there were substantial discounts available to each of these individuals and substantial insurance coverage. So the insurers negotiate with Quest to get a price substantially below that list price. But the list price is a fantasy price. Let's focus on the price actually paid, and they're alleging that the price actually paid is a noncompetitive monopolistic price. So I don't care about all those fantasy numbers. I care about the number they actually pay. Okay. And I understand my point is simply that the insurers are negotiating down the price. That point seems to be sensible, and I get that one. And then the health plans have cost-sharing features so that their members have some skin in the game, and they pay some amount of the test themselves. And the two features that we usually see are deductibles and co-pays. But what's relevant in this case is the deductible, because the allegation of the complaint, I believe it's 54, paragraph 54. The allegation of the complaint is that in each instance, the three plaintiffs had to make a payment out of their deductible because, as was discussed earlier, it wasn't yet exhausted. So a deductible is usually a fixed amount. It could be $500. It could be $1,000. Nowadays, it could be $2,000. It could be, you know, whatever that amount is. It's a fixed, capped amount. And once you hit that amount, and you've made that amount of out-of-pocket payment, you don't pay any more. Your full insurance coverage kicks in. And the standing point, as Your Honor pointed out earlier, the standing point is we do not know from this complaint whether any of these individual plaintiffs would have otherwise exhausted their deductible. I think it's a reasonable inference from stated in the complaint that they paid it out-of-pocket. That's what they say. Now, you may end up in discovery, and maybe you want to do some jurisdictional discovery. I know you've resisted on the other side. You may want to do some jurisdictional discovery to see whether or not they have, in fact, exhausted their — but that sounds like a defense. I mean, they've alleged that they've paid the money. Your Honor, they do allege that. But the problem is this. In each of these — in each of the years in question, 2011, 2012, 2013, the year is closed out. It's a knowable fact that could have been and should have been alleged whether they otherwise would have met their deductible. So let's assume — And you can ask them. So ask them. It should be in the complaint. Plausibility demands. The Spindler v. Johnson & Johnson case stands for this proposition. Plausibility demands that they state whether or not the deductible would otherwise have been met, because if it would not otherwise have been met — Well, they're entitled to some inferences, reasonable inferences. The reasonable inference — The problem — you know, I understand, you know, how trombly, really, in the antitrust context, really it — despite what the Court said and what Judge Fletcher was saying, I mean, it does sort of impose an extra obligation on the plaintiffs to plead. But, my goodness, you want them to plead very, very specific facts. It's just — in my mind, it's even contrary to trombly not to mention Rule 8. I mean, it's just — this is just — look, we have here a complaint in this case. It's only — it's 47 — 50-some-odd pages. And this is a small complaint compared to what we see in some other cases. There are enormous complaints these days. Your Honor — I mean, you're asking for a lot. Your Honor, I don't — I don't believe so. We're talking about whether there's Article III standing and whether we get in the door. Now — Well, you know, I found it interesting that Judge Oreck initially was concerned about constitutional standing in his first order. You get to the second order, there's not even a mention of it. And in the third order, it's the same, zero silence. Well, there is a footnote in the final opinion. Well, but it's not much. And he notes it as a problem. He notes it as a problem in terms of establishing causation. Well, if he really thought there was no antitrust — there was no constitutional standing, he would have said so right up front and just kicked the case. I think — I think, in all candor, the right way to approach this case is the way that he did, which is to go straight to the deficiencies in the antitrust clause. Well, no, that's absolutely the wrong way. Steel Company, by the United States Supreme Court, says you have to say there's Article III. You can't take the easy way out. If easy way out is the merits are easy, you lose, so I'd have to get Article III. No, you can't do that. Well, then perhaps we can infer from his decision that he was satisfied on the Article III point. Yes. That's what I read, that he was satisfied that there was sufficient allegations to meet constitutional standing. Fair enough. But beyond that point, he saw a real problem with the cause — establishing causal harm and with the merits of the antitrust clause. That's correct. That's correct. Fair enough. But, you know, the — and the pleading is very specific on Eastman. They say she was — other tests were paid by the plan, and this one wasn't. So, I mean, you may win on that in discovery, but, you know, it's pretty specific. Understood, Your Honor. If I may, I'd like to say a few words about the leveraging theory that we talked about. The various practices that are alleged. That would be helpful. Yes. So, as you know, there are three or four theories of exclusionary conduct stated in the Second Amendment complaint, and one of them is that, in effect, Quest gave very low capitation rates to physician groups. With some — and there's a bit of wiggle in the complaint on this, but with some understanding, some commitment on the part of the physicians to also send their higher-priced fee-for-service work, which would be paid by the plans rather than the physicians themselves. Or by the individual who's not insured. Correct. Correct. Or by a government health plan. Whoever it might be, whoever that third-party payer or individual is who's paying the fee-for-service amount. This is not an allegation that I think should concern you deeply here and certainly shouldn't provide a basis for a remand. And here's why. There is no allegation of any substantial foreclosure resulting from that practice. First of all, it's not true. But I understand that we're here today. We need to treat those allegations as if they were. First of all, there is no such commitment. And I would note there's no allegation that there's any written agreement. In fact, the only written agreement that exists and that is alleged is a capitation agreement, which plaintiffs concede does not include any commitment of this type. But again, let's be generous. Let's assume the allegation to be true. How many physicians are tied up with these capitation rates? We don't know from this complaint. How much foreclosure might there be? We don't know from this complaint. It simply says that there is this alleged practice of giving low capitation rates to some physician groups, unnamed, completely unidentified. We don't know their size. We don't know whether it's one group, whether it's three physicians, ten physicians, a hundred physicians. So we have no basis from this alleged practice from determining that there's any substantial foreclosure. What we do know is that there's discounting. And discounting is usually thought to be a good thing from the perspective of consumers and from the perspective of antitrust law. Now, could discounting be predatory? It can be. There's a very difficult standard under Brook Group, and plaintiffs do not allege that that standard is met here. Can it otherwise be exclusionary? Perhaps. This Circuit's Peace Health decision perhaps leaves that door open, but it would be a difficult showing to make. But discounting is good. And discounting in and of itself confers no ability to raise your prices on the fee for service side. So the mere fact, if the theory is that we're leveraging by we're giving great prices over here and thereby enabling ourselves to raise the prices, how is that so? We have the insurance companies over there. We have Medicare setting prices. There's no ability to increase beyond the amounts established by Medicare itself. And with respect to payers, we know from this complaint that they're negotiating hard, that they are, in fact, alleged to be negotiating hard. I think the argument is this. The price that they can charge the plans, Medicare, the individual payers is limited. Because certainly those players, particularly the plans, have a fair amount of power, but it's a price in which they're making some money, and they like that price. And what they want to do is increase the number of orders that go to that payment. So what they do is they go to the doctors, offering them a really good price on capitation, because that then is going to give them the business that is quite profitable. That's the argument. And, Your Honor, the argument further, I believe, is that the doctors prefer that. The Second Amendment complaint says they have a preference for one-stop shopping. Well, of course. To take the complaint in a sympathetic way, the doctors prefer it on two reasons. Number one, they get a really good price on capitation, and the doctors care about that, because they pay that themselves. And then they get the convenience of, I just have the quest form on my office. I don't have to have LabCorp or anybody else. No, that's part of their allegation. And meeting the preferences of your customers, Your Honor, is something that a company that is acting in a competitive way, a pro-competitive way, ought to want to do. That is for the welfare of consumers, and it is not the behavior of a monopolist. And what if the capitation price charged to the doctor is actually below cost? At what point does this look like a de facto kickback scheme? Well, first of all, kickback is not alleged in the Second Amendment complaint. I said de facto, and looks like. Nor is it a cognizable theory under the antitrust laws. But to get to your specific question of below cost, the complaint is unclear on this point. There's an allegation that it's below cost, but it's not clear below whose cost. In other words, the complaint — Who's else cost is it going to be? Well, it could be other laboratories that are not as efficient, that don't have the lower unit costs and substantial economies of scale that Quest is alleged to enjoy. Okay? So it — but let's assume that it's below Quest's cost. Now, that's a very, very generous assumption, because there's absolutely no specificity about what Quest's costs are or what possible basis these plaintiffs have for alleging that it's below Quest's costs, and that it would lose money servicing those accounts. But assuming it to be true, that would raise a potential Brook Group predatory pricing issue, which hasn't been alleged in this complaint. And I don't know what else to say about it. If it were, you know, in a sense a kickback, I think that would raise other issues, but it's not a Section 2 of the Sherman Act issue, and we're dealing with Section 2 of the Sherman Act today. Thank you, counsel. Your time has expired. Thank you, Your Honor. The case has started. You'll be submitted for decision, and we'll be in recess for the morning. I think you didn't get to it. No, you didn't. You used your time, but I'll give you two minutes if you want. Yeah, but stick to the two minutes. The very quickly, the tying only viable economic option and the de facto exclusive dealing with providers are very similar. We use the same fact pattern, and we say that if it doesn't meet the tying coercion test, then it does meet the dense-splied de facto exclusive dealing test. Now, this is not just benign package discounting. If that was enough, I mean, just giving a differential, if you take the second product, that all the cases we cite as a matter of law in our brief for economic coercion and only viable economic option are wrong as a matter of law, that doesn't get them home. This is not a case where if you want our peanuts, you got to take our popcorn and we'll give you a special price. This is a case where we're giving you a very low, sometimes, we don't say all the time, below cost. And Brook Group has nothing to do with these cases that we cite in this doctrine. If you want that, if you want the good price on the peanuts, you've got to take our popcorn. But you don't have to take all the popcorn you ever use. You're not coerced to take the entire popcorn, all the popcorn. And also, in the complaint, we have a very specific allegation that this is not just we have a salesman, Mr. Denzel, at Excerpt of Record 114-109, saying, look, the deal is, if you want this low capitated pricing, and this is a declaration sponsored by the Attorney General of the State of California in another litigation, you've got to take, you've got to give us all our pull-through. And he says, in very rare circumstances did they not do it. And one of the reasons is, one, stop shop. Two, it's very difficult for the rivals in the capitated market to attack that very low-pricing because it's all under exclusive formal contract. So they can't even get in there to make a quote to try to get the pull-through business. That makes it even more effective. So, and more, in this circuit, 1977, if a sufficiently appreciable number of buyers have accepted the tie, it's enough to make out coercion. As to paragraph 18, I don't know why my learned colleague referred that paragraph. This is what it's, I think he referred to it as basically saying there is vigorous competition here and there is no market power. It reads, today, largely because of Quest exclusionary practices, it has only one substantial competitor in the planned outpatient market, Laboratory Corporation of America. The market is very concentrated and Quest has by far the dominant market share and Laboratory Corporation only is a fringe competitor. I don't think that says what learned counsel says it says. Thank you, Your Honor. Roberts. Kessler will be submitted for decision and will be in recess for the morning. All rise.
judges: Thomas, W. Fletcher, Paez